**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Michael Cohen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: mcohen@rosenlegal.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JONATHAN TEPLITSKY, LOREN LEVY, and TY SAO, Individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DAPPER LABS, INC., and FLOW FOUNDATION,<br><br>Defendants. | Case No. 26-cv-04066-VM<br><br>AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiffs Jonathan Teplitsky, Loren Levy, and Ty Sao (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants Dapper Labs, Inc. ("Dapper Labs") and Flow Foundation (collectively, "Defendants"), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public statements,

social media posts, media reports, websites, and other publicly available reports and information about Defendants, and information readily obtainable on the Internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery. Plaintiffs hereby allege as follows:

## INTRODUCTION

1. Blockchain technology has exploded in popularity in recent years precisely because it enables a "trustless system"—that is, because it enables diffuse networks of individuals to transact on a public ledger without the need for trust in a central authority.

2. Due to the blockchain's core tenets of decentralization and immutability, blockchains represent a fundamentally new way of coordinating social trust, replacing the need to trust powerful institutions and freeing up individuals to instead place their trust in the protocol itself.

3. Bitcoin is the most prominent example of this revolutionary system. It is radically decentralized. Validation, control, and decision-making are distributed across many independent actors who need not trust each other for the system to run.

4. Many varieties of blockchains have followed in Bitcoin's wake, employing a number of cryptographic principles. One example is the Flow blockchain, created by Dapper Labs to allow for a range of scalable applications without compromising the decentralization of the network.

5. From the very beginning, Dapper Labs emphasized the decentralization of the Flow blockchain, and purchasers of Dapper Labs' flagship Flow Token believed they were buying into an ecosystem governed by the rules of the protocol rather than the whims of its leaders.

6. While Flow does consist of a network of independent nodes that validate transactions, the power to control the blockchain remained concentrated in the hands of a powerful central authority.

7. The public did not understand this until the wake of a security incident that took place in December of 2025.

8. After an exploit in which an attacker minted fraudulent tokens and managed to siphon $3.9 million from the Flow network, the core team in charge of Flow acted in ways that were deeply inconsistent with the decentralized control it had long touted, first by unilaterally announcing a rollback of the blockchain and then – after facing intense backlash – pivoting to a revised plan that involved granting a privileged account administrative superpowers so that it could enter individual accounts in search of fraudulent tokens and destroy them.

9. These actions revealed that, while Flow's network is decentralized in certain ways, it is ultimately governed not by math but by men. Its many claims that it is controlled by the community were misleading at best.

10. Now that the public understands that purchasing Flow Tokens is, essentially, an investment in an ecosystem controlled by the core team at Dapper Labs and the related Flow Foundation (the "Core Team"), rather than in an actual trustless system like Bitcoin or Ethereum, the market for Flow Tokens has collapsed and hundreds of millions of dollars have evaporated.

11. Regardless of what the Defendants intended when they repeatedly touted the decentralization of the Flow ecosystem, the market's dramatic loss of trust in the decentralization and governance of the Flow blockchain demonstrates that Defendants' conduct constitutes a deceptive act in violation of the law. Plaintiffs and the Class have suffered significant damages in an amount to be proven at trial.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest or costs; and (3) there is minimal diversity because at least one plaintiff and defendant are citizens of different states.

13. This Court may exercise personal jurisdiction over Defendants because Defendants either reside in or maintain business in this District, maintain and have continuous and systematic contacts with this District, do substantial business in this State and within this District, and engaged in unlawful practices in this District as described in this Complaint, so as to subject themselves to personal jurisdiction in this District, thus rendering the exercise of jurisdiction by this Court proper and necessary.

14. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and (c). Defendants engaged in unfair practices in this Judicial District and damages took place in this Judicial District.

15. Venue and jurisdiction are additionally proper in this District because many of the acts complained of herein, including the unfair practices, originated and/or occurred, at least in part, in this Judicial District. Further, Defendants sold Flow Tokens to purchasers located in this Judicial District, employing the unfair practices complained of herein.

## PARTIES

16. Plaintiff Jonathan Teplitsky is a citizen of Florida. Plaintiff Teplitsky and members of the Class purchased and/or acquired Flow Tokens and held them as of December 27, 2025, and were injured thereby.

17. Plaintiff Loren Levy is a citizen of California. Plaintiff Levy and members of the Class purchased and/or acquired Flow Tokens and held them as of December 27, 2025, and were injured thereby.

18. Plaintiff Ty Sao is a citizen of New Jersey. Plaintiff Sao and members of the Class purchased and/or acquired Flow Tokens and held them as of December 27, 2025, and were injured thereby.

19. Defendant Dapper Labs is a corporation based in Vancouver, Canada. Dapper Labs is a technology company focused on the Flow blockchain, the Flow Token, and the Flow digital ecosystem. Dapper Labs has employees across the United States, including in New York, Florida and California, and targeted, and sold Flow Tokens to, purchasers in each of these states during the relevant period. Dapper Labs' founder and Chief Executive Officer is Roham Gharegozlou.

20. Defendant Flow Foundation purports to be a non-profit organization dedicated to supporting the Flow blockchain and Flow Token, both of which were created by Dapper Labs.

21. Dapper Labs and the Flow Foundation are referred to collectively as "Defendants."

## NEW YORK NEXUS

22. Defendants have purposely made New York City a recurring hub for developer outreach, hackathons, business development activities, public events and marketing efforts aimed at expanding the Flow blockchain, Flow Token, and the broader Flow digital ecosystem.

23. In fact, Dapper Labs' website – which identifies itself as the "team behind" Flow and reports tens of millions of wallets on Flow – states that the company is "Vancouver-based, with hubs in L.A., New York, and Charlotte." By Dapper Labs's own description, New York is one of the small number of locations that it has affirmatively selected as a hub for its business.[1]

---

[1] In addition, Dapper Labs's survival early on, and its subsequent multi-billion dollar valuation,

24. Dapper Labs's New York activities relate directly to the claims asserted here. Through its New York events and presence, Dapper Labs and the closely affiliated Flow Foundation have recruited developers, encouraged the creation and deployment of applications on Flow, induced participants to conduct transactions on the Flow blockchain, promoted Flow to strategic and commercial partners, and sought to increase the use and adoption of the Flow network and therefore the value and utility of its native Flow Token. At the same time, Dapper Labs and the Flow Foundation – including in New York – repeatedly marketed decentralization, community control, and the absence of centralized authority as defining attributes of the Flow ecosystem. These New York contacts concern the same Flow blockchain, Flow Token, digital ecosystem, and the same core representations concerning decentralization that are now at issue.

25. Defendants frequently conduct their ecosystem development and marketing activities under the common "Flow" name, rather than publicly identifying the particular legal entity responsible for each contract, employee, or event. Various New York event materials expressly identify the Flow Foundation as the host or identify Flow Foundation officers and personnel as participants.

26. While it purports to be legally independent, the Flow Foundation has been very closely associated with Dapper Labs since Dapper Labs established it in late 2021 to support the development of the Flow blockchain and Flow Token. For instance, Dapper Labs' founder and CEO, Gharegozlou, works for Dapper Labs, sits on the board of the Flow Foundation, and runs

---

was heavily funded by venture capital firms based in New York. Examples of New York-based investors in Dapper Labs include Union Square Ventures, CoinFund, Digital Currency Group, and Coatue Management. All in all, Dapper Labs has raised hundreds of millions of dollars from New York-based venture capital investors. And the major applications on the Flow blockchain allow users to buy, sell and collect digital assets and NFTs bearing content licensed from media companies and sports leagues. Accordingly, Dapper Labs' business depends heavily on its entertainment partnerships with New York-based entities including the NBA and the NFL.

the day-to-day operations of both Dapper Labs and Flow Foundation. Gharegozlou is ultimately in charge of both organizations.

27. In addition to Gharegozlou, Dieter Shirley – the former Dapper Labs CTO often referred to as a co-founder of Dapper Labs – sits on the board of the Flow Foundation as well. Shirely appears to have formally left Dapper Labs and is now the Flow Foundation's Chief Architect.

28. At all points during the relevant period, including in response to the security exploit, the top leadership of Dapper Labs and the Flow Foundation functioned as one cohesive Core Team, all under Gharegozlou's control, with no practical separation between these two entities. For instance, the Core Team's internal chat discussing how to respond to the security exploit included Gharegozlou (CEO of Dapper Labs) and Shirley (Chief Architect of Flow Foundation) with no indication or pretense of institutional separation. Slack chats between the two organizations were often combined in this way to allow the top leadership at Dapper Labs and Flow Foundation to work together as one cohesive unit.

29. On information and belief, the Flow-branded New York activities described below were authorized, funded, staffed, controlled, or undertaken for the benefit of Dapper Labs, the Flow Foundation, or both. The precise allocation of responsibilities between the two closely coordinated entities is uniquely within Defendants' possession.

30. Dapper Labs' founder and CEO, Roham Gharegozlou, personally appeared as a featured speaker at major cryptocurrency-related events in Manhattan throughout the relevant period, using those appearances to promote Dapper Labs's Flow-based products and the purportedly open and decentralized Flow ecosystem in which the Flow Token served as the native currency. For example, Gharegozlou was a listed speaker at Messari's Mainnet 2021 summit, held

from September 20 through 22, 2021 at the New York Marriott Marquis; on November 3, 2021, Gharegozlou spoke at the NFT.NYC event in Manhattan, as part of a presentation entitled "Accessible, Open, Inclusive – Let's Put an NFT Wallet in Every Pocket;" on June 22, 2022, Gharegozlou returned to NFT.NYC and delivered a featured presentation entitled "The Year of NFTs" at the New York Marriott Marquis in Times Square; and Gharegozlou appeared at Messari Mainnet 2024, held from September 30 through October 2, 2024 at Pier 36 in Manhattan, where the event's materials identified him both as Dapper Labs' Chief Executive Officer and a member of the Flow Foundation's board.

31. In addition, on information and belief, Gharegozlou regularly interviewed candidates for positions at Dapper Labs while physically in New York City, even if the prospective employees themselves were remote or to based elsewhere.

32. On April 14, 2022, Dapper Labs participated in a Thomson Reuters Institute conference entitled *Manifest Destiny: Risk, Opportunity & Reward Around Digital Currencies*, held at the Westin New York Grand Central hotel in midtown Manhattan. Alex Levine, then Dapper Labs' Head of Regulatory Affairs and Senior Vice President of Legal, hosted a panel entitled "Evolving Wilds: The Emerging Legal Landscape for NFTs."

33. Dapper Labs used that Manhattan event to promote decentralization as a central feature and benefit of Dapper Labs' products and business. In a presentation in connection with the event, Dapper Labs, on the very first slide, stated that "[d]ecentralized blockchains and NFT's solve" the "big problems" associated with "centralized internet platforms."

34. Dapper Labs further represented: "Our mission is to bring decentralized, transparent, blockchain computing to billions of people[.]" The presentation identified Dapper

Wallet, NBA Top Shot and other Dapper Labs products built on the Flow blockchain as the consumer-facing means by which Dapper Labs intended to accomplish that goal.

35. Defendants continued to use New York City as a destination for coordinated Flow ecosystem expansion. On September 4, 2024, Flow announced a "Flow World Tour" through which the Flow team would travel to selected locations to find and develop what it called the next "killer app" on the Flow blockchain. The announced tour included two New York City stops: an appearance at a prominent crypto startup accelerator and a major crypto conference in September and October 2024. In the same announcement promoting the Flow World Tour and its New York stops, Flow described its objective as creating "a decentralized App Store" in which value creation would be driven and shared by users. The announcement also described a feature called Community Rewards and positioned it as a way of realizing the vision of a decentralized App Store, stating that "developers can use Community Rewards to demonstrate how tokens can be used within applications."

36. On June 24, 2025, the Flow Foundation and Google Cloud held a business-development event in Manhattan entitled "Culture X Consumer Dinner by Flow.com & Google Cloud @ Permissionless & NFT NYC." The invitation read that "[t]he Flow Foundation invites you" to a salon dinner for… " the architects and leaders who will define the next decade of open systems, digital ownership and interactions on the internet." Defendants used the event to promote the purportedly decentralized Flow ecosystem and Flow Token that powered it.

37. From August 15 to August 17, 2025, Flow was a principal sponsor and participant in ETHGlobal New York, a major hackathon held in Manhattan. Flow offered $20,000 in prizes aimed to encourage development on Flow. To qualify, developers were required to deploy smart

contracts and/or transact on the Flow blockchain. Flow also held an in-person technical workshop and provided developers with early access to new Flow technology.

38. The ETHGlobal materials identified senior Flow Foundation personnel as speakers, judges and mentors, including Dieter Shirley, the co-founder and former Chief Technology Officer of Dapper Labs who later became a Flow Foundation board member and its Chief System Architect. The materials also directed prospective applicants to employment opportunities with the Flow Foundation. Thus, the Foundation's senior personnel appeared in New York and participated directly in the hackathon and related developer-recruitment activities.

39. Dapper Labs's founder and CEO, Gharegozlou (who also serves on the Flow Foundation's board) publicly confirmed the presence of a coordinated Flow team at the Manhattan event. In connection with that event, Gharegozlou tweeted on August 17, 2025: "Just heard from the team in NYC that @flowblockchain was the most built on out of all platforms at @ETHGlobal, not just L1/L2 chains.🤯 Seemed like people liked your talk @dete73."

40. Dete73 refers to Dieter Shirley (commonly known as "Dete"), who, as mentioned above, is often considered to be a co-founder of Dapper Labs, along with Gharegozlou, and is now a board member and the Chief System Architect of the Flow Foundation.

41. Shirley was a featured speaker at the Pragma New York summit in Brooklyn in August 2025 as well, where he gave a speech entitled "The Future of Consumer Crypto with A.I."

42. These events were not isolated contacts; one can see why Dapper Labs calls New York a hub of its business. Rather, they formed a sustained course of New York business activity through which Dapper Labs, the Flow Foundation, and their common Flow personnel cultivated developers and commercial partners, distributed financial incentives, promoted Flow applications, generated Flow transactions, recruited employees, and publicly reinforced the

representation that Flow was a decentralized ecosystem. Defendants' New York activities were therefore an operative part of Defendants' promotional campaign portraying Flow as decentralized that is challenged in this action.

43. Dapper Labs also made representations concerning its purported lack of control over Flow directly to the United States District Court for the Southern District of New York. In *Friel v. Dapper Labs, Inc.*, 21-cv-05837-VM (or "*Friel*"), Dapper Labs and Gharegozlou faced a class action lawsuit in this Court related to the Flow blockchain's major application, NBA Top Shot.

44. After the Court found that the plaintiffs had stated a claim that the NFTs offered for sale on NBA Top Shot – NBA Top Shot Moments or simply "Moments" – constituted unregistered securities in violation of federal law, Dapper Labs and Gharegozlou filed an Answer on March 15, 2023. Among the defenses Dapper Labs presented was that Dapper Labs does not control the Flow blockchain.

45. Dapper Labs subsequently entered into a settlement filed with this Court that again addressed the extent of Dapper Labs's control over the Flow blockchain and Flow Tokens. As part of that settlement, Dapper Labs agreed to a series of business changes aimed at addressing the plaintiffs' allegations in that case.

46. These business changes included, *inter alia*, ensuring that Dapper Labs is not in control of the Flow blockchain, that the Flow blockchain is a "completely decentralized public blockchain," and that Dapper Labs hands over the Flow Tokens allocated to ecosystem development to the Flow Foundation.

47. Dapper Labs expressly agreed that the settlement – including its obligations concerning control of the Flow blockchain and the transfer of Flow Tokens to the Flow

Foundation – would be treated as having been "negotiated, executed and delivered" and "wholly performed" in New York and would be governed by New York law. Dapper Labs's counsel appeared in Manhattan to support its approval.

48. Dapper Labs's representations in *Friel* are directly related to the present action, as they concern the same Flow blockchain, the same Flow Tokens, the same relationship between Dapper Labs and the Flow Foundation, and the same central factual proposition challenged here: whether Flow is really a decentralized and community-controlled blockchain or one that Dapper Labs and its affiliated Core Team maintain the unilateral ability to control.

49. More, the CEO of Dapper Labs leveraged that settlement as a way of further touting the decentralization of Flow. He tweeted out on June 3, 2024: "Great news! We @dapperlabs today announced a legal resolution that reaffirms two of our most important positions… The settlement also involves Dapper Labs reaffirming its commitment to the decentralization of Flow, as well as confirming the full transfer of all $FLOW coins as part of the ecosystem development reserve to the Flow Foundation."

50. While the issues at stake in the *Friel* matter – including the extent and nature of Dapper Labs's control over the Flow blockchain – are most similar to the action here, the *Friel* matter is not the first time that Dapper Labs took the position in the Southern District of New York that Flow is a decentralized blockchain run by community consensus.

51. By the time the *Friel* lawsuit was filed, Dapper Labs had already invoked the authority of the Southern District of New York to protect its Flow-related commercial interests. On February 12, 2021, Dapper Labs commenced *Dapper Labs Inc. v. Goetz*, No. 21-cv-01289 (PAE) (S.D.N.Y.) ("*Goetz*"), asserting trademark claims against the issuers of an unrelated token called the "Flow Protocol Token" that, Dapper Labs pleaded, infringed on its Flow Token.

52. In that case, Dapper Labs pleaded, *inter alia*:

> <u>DAPPER DEVELOPS, ADVERTISES, AND SELLS THE FLOW TOKEN</u>
>
> 42. Dapper also planned to release a fungible cryptocurrency token: the Flow Token. It is widely understood in the blockchain space that any blockchain network, such as the Flow Blockchain, must have a native token. This is because the Flow Blockchain is a software platform on which users pay to access the digital experiences by using the native token—in this case, the Flow Token, for the Flow Blockchain—to make payment. Native tokens are made available to users of the blockchain community through a variety of mechanisms….
>
> 43. The Flow Token is key to maintaining and operating the Flow Blockchain. First, in order to access and use the Flow Blockchain, a user must pay transaction fees in Flow Tokens; such transactions can include a developer deploying a smart contract (a program that runs on the blockchain) to a consumer utilizing such smart contract (running the computation on the blockchain). Second, in order to become one of the decentralized "nodes" on which the Flow Blockchain operates, node operators must "stake" Flow Tokens as an economic incentive alignment mechanism. The collective activities of the node operators comprise the blockchain. The Flow Blockchain rewards node operators for their contributions of running the blockchain by distributing transactions fees paid to the network and newly created Flow Tokens; conversely, malfeasance by a node operator results in such stake to be "slashed", or forfeited, as a penalty. Third, participation in the governance and ongoing operation of the Flow Blockchain platform is based on holding the Flow Token. Additionally, developers can incorporate the Flow Token in their applications as the primary currency used for payments and as a medium of exchange.
>
> *Goetz*, Dkt. No. 1, ¶¶42-43.

53. Dapper Labs also boasted to the court that, as of that time, 155 developers in New York had already built on the Flow blockchain. *Goetz*, Dkt. No. 1, ¶37.

54. Dapper Labs further told the court: "***<u>Dapper uses the FLOW Mark in the blockchain and cryptocurrency space in the sale, offering for sale, advertising, marketing, and promoting of its goods and services throughout the State of New York and throughout the United States of America</u>***." *Goetz*, Dkt. No. 1, ¶103. (Dapper Labs likely phrased its New York activities in terms of marketing goods and services on its blockchain, rather than the Flow Tokens

that power the transactions on that blockchain, because Flow Tokens did not officially become available to U.S investors until later that year. FLOW was listed for trading on Coinbase in 2022, a virtual and cryptocurrency exchange that is licensed and supervised by the New York Department of Financial Services.) This is powerful evidence of Dapper Labs's purposeful activities promoting and marketing its purportedly decentralized blockchain and ecosystem in New York. Defendants should not be permitted to rely on their business activities throughout the State of New York when they are seeking court protection and then disclaim their New York contacts when it suits them.

55. Dapper Labs also employs numerous high-level employees who are based in New York and focused on expanding the reach of the Flow ecosystem and value of the Flow Token. These include, based on public sources, the Company's Chief of Staff/Head of Community, and a legal compliance officer based in New York and admitted to the New York bar.

56. Publicly available information from the job search website Glass Door further indicates that Dapper Labs maintained a meaningful workforce in New York. Glass Door identifies 15 Dapper Labs salary submissions associated with New York across 13 different job titles, including senior software engineers, software engineers, a front-end developer, a technical director, product and project personnel, designers, communications personnel, and partnerships personnel. This corroborates Dapper Labs's own claim that New York is a business hub for the company.

57. Finally, Dapper Labs's New York footprint is further corroborated by Dapper Pay US Inc., an affiliated payment entity registered to do business in the state that was set up to support transactions in the Dapper Labs ecosystem—the transactions that give Flow Token its value.

58. Dapper Pay has publicly filed to engage in "regulated payment services" and its corporate filings identify Stephanie Lemmerman as its Chief Executive Officer, Chief Financial Officer, and Secretary. Lemmerman simultaneously served as Dapper Labs's CFO and later joined Dapper Labs's board.

59. On September 23, 2022, Dapper Pay registered as a foreign business corporation authorized to conduct business in New York. Dapper Pay has continued to file biennial statements in New York, and is listed as an active foreign business corporation. Its registered agent is in Manhattan.

60. Dapper Pay's registration to conduct regulated-payment business in New York provides additional evidence of the Dapper Labs corporate family's deliberate and sustained New York business presence. In fact, the same week that Dapper Pay registered to do business in New York, Dapper Labs announced that the Flow Token was now supported in the Dapper Wallet feature so that people could make payments in Flow Token, stating that "bringing FLOW to Dapper has always been our vision" and further that: "FLOW currency is the fuel that powers the Flow blockchain and is the keystone for an inclusive and borderless digital economy."

61. Taken together, all of these contacts – including but not limited to identifying New York as a company hub; employing multiple key personnel in New York; repeatedly conducting marketing and business development activities in Manhattan; representing to this Court that Flow was decentralized and outside of the control of Dapper Labs and then using those decentralization representations to attract further investments in Flow Tokens; as well as Dapper Pay's registration to conduct business in New York – establish a purposeful and substantial connection to New York. Plaintiffs' claims arise from those contacts in that they challenge the core representation of

Flow as a decentralized blockchain that Defendants, through their New York contacts, impressed upon investors.

## BACKGROUND

***Introduction to Cryptocurrencies and Blockchain Technology***

62. Cryptocurrencies are digital assets designed to function as a medium of exchange, a store of value, or both.

63. Cryptocurrencies rely on a variety of cryptographic principles to secure transactions, control the creation of additional units, and authenticate the transfer of digital assets.

64. Bitcoin, for example, was the world's first cryptocurrency. It is also the world's largest and most popular cryptocurrency, with a market capitalization over $1.5 trillion. Bitcoin was the fastest asset to reach a $1 trillion market capitalization, which it achieved in only twelve years.

65. At the core of Bitcoin is a public ledger that tracks the ownership and transfer of every unit of Bitcoin. The ledger is known as a blockchain.

66. Just as Bitcoin was the world's first cryptocurrency, Bitcoin is seen as the first functioning blockchain, as it successfully devised a framework of incentives that encourages a decentralized network people to do the work of validating transactions on a distributed network.

67. In the case of Bitcoin, those engaged in the validation must solve a "Proof of Work" mathematical problem by expending computational resources. The first person to solve the "Proof of Work" problem is rewarded in newly minted Bitcoin. This process is known as "mining" Bitcoin.

68. While the "Proof of Work" consensus mechanism popularized by Bitcoin is not shared by many of the blockchains that would come later, blockchains are generally designed to achieve the same goals of decentralization, immutability and transparency.

69. Regardless of the consensus mechanism, blockchains rely on cryptographically-linked blocks and economic incentives to drive network participation and power the network. The core appeal of blockchain technology is that no single entity controls the system, as all transactions are recorded, verifiable and permanently inscribed on a public ledger.

70. Accordingly, blockchains make use of cryptographic methods to create a sort of "trustless system" where participants can transact directly with one another without having to rely on central intermediaries such as banks or governments.

***The Blockchain's Core Tenets: Decentralization and Immutability***

71. Decentralization and immutability are considered to be the two core tenets of blockchain technology because together they solve the fundamental problem blockchain was designed to address: how to maintain a trustworthy and indelible record of transactions without relying on a central authority. Each tenet addresses a different aspect of trust.

72. Decentralization means that the blockchain's ledger is not controlled by a single organization, authority or server. Instead, the blockchain is maintained by many independent computers, called nodes, spread across the network. The existence of many, independent nodes is critical, as it shifts trust from institutions to protocolized rules and cryptography.

73. Immutability means that once a transaction occurs on the blockchain, it becomes extremely difficult to delete, undo, or tamper with.

74. Immutability is a function of the way blocks are arranged on the chain.

75. If an attacker tries to tamper with a block on a blockchain, for instance, it breaks the links to the surrounding blocks.

76. Because the blocks are connected, altering one block breaks all of the blocks after it in the chain, requiring massive amounts of rewriting in order to tamper successfully. The result

is that rewriting history is very hard if not impossible. This is by design.

77. If a system were decentralized but not immutable, transactions could easily be written. Trust in that system would still require trusting the blockchain's participants, not its cryptography.

78. If a system were immutable but not decentralized, a central authority could still determine what gets recorded or discarded. Trust in that system would require trusting a central authority to oversee the chain.

79. Accordingly, both of these core tenets – decentralization and immutability – are necessary for a blockchain to be seen as reliable, safe and trustworthy.

## RELEVANT FACTUAL ALLEGATIONS

***Dapper Labs and the Flow Ecosystem***

80. In 2018, Roham Gharegozlou founded Dapper Labs to focus on the development of blockchain-based programs and applications.

81. Before founding Dapper Labs, Gharegozlou had created a successful application known as CryptoKitties, which ran on the Ethereum blockchain. The application allowed users to breed and collect a variety of customizable digital cats.

82. The popularity of CryptoKitties, however, caused significant congestion on the Ethereum blockchain, which, like Bitcoin, relied on the Proof-of-Work consensus mechanism.

83. As a result, Dapper Labs announced in 2019 that it was creating its own blockchain, known as Flow.

84. Unlike Bitcoin and Ethereum which relied on Proof-of-Work, the Flow blockchain relies on a consensus mechanism known as Proof-of-Stake.

85. With Proof-of-Stake, miners must pledge a "stake" of digital currency before being

able to validate transactions. A miner's capacity to validate transactions depends on how many tokens the miner has put up for stake and how long the miner has been validating transactions. The more tokens the miner owns, the more power for mining.

86. Compared to Proof-of-Work blockchains, which require miners to solve equations and use significant amounts of energy, Proof-of-Stake blockchains are designed with energy-efficiency and scalability in mind.

87. Proof-of-Stake blockchains require a native token that can be used to power the network, as users stake their tokens to validate transactions and earn additional tokens as a reward.

88. To power the Flow network, Dapper Labs created the Flow Token.

89. Dapper Labs' website described the Flow Token as "the native currency for the Flow network and the keystone for a new, inclusive, and borderless digital economy. If blockchains are digital infrastructure, the Flow token is the fuel that powers the network… The economic impact is that as more value is created on top of the Flow blockchain, more demand is generated for FLOW token."

***Defendants Repeatedly Tout the Decentralization of the Flow Blockchain***

90. From the very beginning, Dapper Labs touted Flow as a decentralized blockchain—and one that would become even more decentralized as the network matured over time.

91. This was a key selling point. In its blog post unveiling the Flow blockchain in September of 2019, for instance, Dapper Labs announced: "After nearly two years of research we are happy to present Flow, a blockchain design that can meet mainstream developer and consumer expectations without sharding the network or compromising decentralization."

92. In 2020, on the Introducing the Flow Blockchain portion of its website, Dapper Labs again touted: "Flow is based on a novel architecture that achieves the performance required

for mainstream applications without compromising decentralization."

93. Dapper Labs continued to stress decentralization in 2021, and further elaborated on the so-called "progressive decentralization" of the Flow blockchain.

94. "Progressive decentralization" is a development strategy employed by blockchain networks, and it means that, while a blockchain might start off with significant control in the hands of its creator, the creator transfers control to the broader community over time.

95. In the context of Dapper Labs and the Flow blockchain, the phrase refers to the often-repeated notion that Flow was initially developed and operated by the core team at Dapper Labs, but the network would become increasingly decentralized as more independent validators, developers, and community governance initiatives took over key roles.

96. Tech news outlet Decrypt ran an article in October 2021, for instance, entitled: *Flow Blockchain Now 'Controlled by Community,' Says Dapper Labs*, with the sub-headline: *The network behind NBA Top Shot has gradually decentralized, with Dapper now running less than one-third of the total nodes.*

97. The article reported: "Now, a Dapper representative tells *Decrypt* that the Flow [blockchain] is 'fully open and controlled by the community,' with the firm running less than one-third of the active consensus nodes that maintain the proof-of-stake network."

98. The article explained: "Decentralization is critical to the security of all blockchain networks, which are typically distributed across thousands of computers around the world. If a single entity controls the majority of mining power or validator nodes, then it could be possible to alter transactions and double-spend coins, for example."

99. The article continued by quoting Flow product manager Layne LaFrance, who told Decrypt: "We've reduced the number of consensus nodes that Dapper Labs is running to less than

a third. That's enabling a lot more participation in the network for community members, and also is a really important security metric to showcase that the network is run by the community."

100. "Flow has been architected to be a completely permissionless, completely decentralized public blockchain," she explained.

***Dapper Labs Creates the Flow Foundation to Bolster the Impression of Decentralization***

101. In late 2021, Dapper Labs and Roham Gharegozlou faced a class action lawsuit related to the major application on the Flow blockchain, NBA Top Shot.

102. The lawsuit alleged that the NBA Top Shot Moments that Dapper Labs sold on NBA Top Shot constituted unregistered securities under the test that the Supreme Court established in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

103. On February 23, 2023, the Court denied defendants' motion to dismiss, holding that the plaintiffs had stated a claim that Dapper Labs and Gharegozlou sold unregistered securities in violation of federal law. The gist of the Court's opinion was that, by buying Moments, purchasers were investing in a common enterprise with the expectation of profits deriving from the managerial efforts of Dapper Labs.

104. While the Court's *Howey* analysis focused on the Moments that Dapper Labs sold on NBA Top Shot rather than the Flow Tokens that powered the underlying Flow blockchain, the control that Dapper Labs exercised over the Flow blockchain and Flow Tokens was key to the analysis, with the Court writing that: "[t]he interplay among FLOW [token], the Flow Blockchain, and Moments is necessary to the totality of the scheme at issue." *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 434 (S.D.N.Y. 2023).

105. At the motion to dismiss stage, what cemented the Moments' legal status as unregistered securities was that Dapper Labs controlled not only the NBA Top Shot application

and its secondary marketplace, but also the Flow blockchain and the Flow Tokens that powered every transaction: "Plaintiffs' allegations make plausible that but for Dapper Labs's creation, development, and maintenance of the *private* Flow Blockchain, Moments would have no value. *Id*. (emphasis in original).

106. The opinion's core teaching was this: The less control Dapper Labs wields over the applications in the Flow ecosystem and the Flow blockchain and Flow Tokens that power them, the less reliant purchasers of digital assets within the Flow ecosystem will be on the managerial efforts of Dapper Labs.

107. Relinquishing control over the Flow blockchain and Flow Token was not only consistent with the progressive decentralization that Dapper Labs had long touted, then, but it was also an important step towards compliance with the federal securities laws.

108. On June 3, 2024, shortly after the parties had reached a settlement in that case, Gharegozlou tweeted out:

> Great news! We @dapperlabs today announced a legal resolution that reaffirms two of our most important positions: After discovery, it was understood and agreed that @Flowblockchain is a decentralized public network and that digital collectibles like @NBATopShot are not securities in the same way trading cards are not securities… The settlement also involves Dapper Labs reaffirming its commitment to the decentralization of Flow, as well as confirming the full transfer of all $FLOW coins as part of the ecosystem development reserve to the Flow Foundation.

109. Accordingly, as part of settling the lawsuit alleging that NBA Top Shot Moments constituted unregistered securities, Dapper Labs and Gharegozlou agreed to a series of corporate reforms aimed at addressing the plaintiffs' allegations in that case.

110. These corporate reforms included ensuring that Dapper Labs was no longer in control of the Flow blockchain, and also ensuring that the Flow blockchain was architected to be a completely permissionless, completely decentralized public blockchain that would continue to

exist in perpetuity even if Dapper Labs ceased to exist.

111. In addition, as a condition of that settlement, Dapper Labs and Gharegozlou agreed to deposit the remaining Flow Tokens allocated for Ecosystem Reserve at the launch of the Flow blockchain into the Flow Foundation's wallet and to relinquish control over such tokens.

112. As that reference to the Flow Foundation suggests, the Flow Foundation was a purportedly independent foundation set up in late 2021 to promote the decentralization of the Flow blockchain, tokens and ecosystem.

113. While originally the personnel that built and maintained the protocol for the Flow blockchain consisted entirely of engineers employed by Dapper Labs, the responsibilities for governing the blockchain protocol were supposed to shift to the independent Flow Foundation over time. In short, the Flow Foundation exists to project the appearance that it is the decentralized community, not Dapper Labs, that controls the Flow blockchain.

114. Consistent with that mission, the Flow Foundation has been, and is, a leading voice trumpeting the decentralization of the Flow blockchain.

115. The Flow Foundation has an entire page on its website dedicated to decentralization.[2] The Flow Foundation states: "Is Flow Decentralized? Flow is fully decentralized, open, and controlled by the community."

116. The website continues: "Flow was built to be decentralized from the start, and has continued to become more decentralized over time. With more than 10,000+ developers in various stages of building applications on Flow, over 3,000 smart contracts currently deployed on Flow, no more than 1/6th of the nodes controlled by a single entity, and a range of projects and teams all building on Flow. Anyone can join in on help to secure and further the decentralization of the

---

[2] *See* https://flow.com/decentralization.

network."

117. The websites continues: "Here are some ways in which Flow is decentralized," listing:

**Nodes are operated by community members:**

Anyone can become a validator on Flow by staking FLOW tokens and running a node. This ensures that the network is not controlled by any single entity.

**Network is inherently secure by separation of concerns.**

Flow uses a unique multi-role process where consensus is separated from transaction execution. This separation of concerns makes the network inherently more secure and resistant against attack.

**The network is designed to scale without sharding:**

Flow is designed to scale without sharding, which is a technique that divides the network into smaller subnetworks. This allows Flow to achieve high throughput and low latency while maintaining decentralization.

**Network governance and FLIPs process**

Flow's governance structure has been crafted to prioritize network safety, transparency, and longevity. With a community-led approach to drive platform maintenance, administration, and growth, Flow governance effectively serves the collective needs of the community.

118. Finally, the Flow decentralization page states: "Flow's decentralized infrastructure is designed to ensure the security, scalability, and reliability of the network," touting that: "By decentralizing the network, Flow makes it more resistant to attack and more accessible to developers and users."

***After Being Hacked in Late 2025, Defendants' Actions Reveal that the Decentralized Control of Flow is Illusory***

***The Exploit***

119. On December 27, 2025, the Flow blockchain experienced a security incident in which a hacker exploited a vulnerability in the network in order to mint a large number of counterfeit tokens.

120. Almost immediately after the hacker began minting counterfeit tokens, the hacker transferred them to numerous Flow accounts.

121. Including accounts that received token transfers from the intruder as well as

accounts that interacted with those accounts, over 1,000 accounts were contaminated in some way.

122. Large transfers were made to centralized exchanges, and some assets were successfully bridged off of the network. All in all, the hack was able to extract about $3.9 million from the network.

123. About six hours after the first malicious transaction, the validators halted transactions on the Flow blockchain.

124. The exploit was not a traditional wallet theft aimed at stealing funds from users or user wallets. Instead, it infiltrated the token-minting mechanism in what is known as the network's execution layer, which enabled the creation of fraudulent tokens, which were then swapped for real assets, and moved off of the blockchain. This type of intrusion strongly suggested the existence of centralized points of control on the Flow network.

***The Core Team Deliberates Behind Closed Doors***

125. The Flow Foundation had been a standalone entity for years prior to the exploit and is supposed to be nominally independent of Dapper Labs, however, events during and after the security incident reveal that separation to be illusory or, at least, much less than a reasonable consumer would understand it to be.

126. While it was the Flow Foundation, rather than Dapper Labs, that confirmed the security incident and updated the public on remediation efforts, behind the scenes, it was the Core Team – including Gharegozlou at Dapper Labs and Shirley at the Flow Foundation – that determined the response to the incident as if the Flow Foundation were simply part of Dapper Labs.

127. Immediately after the incident, the Core Team, including Gharegozlou and Shirley, discussed possible solutions for securing the network.

128. One of the first – if not the very first – solutions this group debated centered on what is known as the service account.

129. The service account is a privileged administrative account on the Flow blockchain that enjoys elevated privileges. The service account manages important protocol-level functionality on the Flow blockchain, and it is one of major tools the Core Team uses to control system contracts and network configuration.

130. Unlike the accounts of normal users, the service account has authority to perform actions that can affect the entire blockchain. The service account has administrator access to the Flow Token smart contract and can mint and burn tokens.

131. While the Flow Foundation claims it does not unilaterally control the service account, as the service account is a so-called multi-signature or "mult-sig" account requiring multiple parties to sign off on decisions, the number of signers needed to control the service account is extremely small. In fact, while four signatures are formally required to activate the service account, three of the four can come from accounts controlled by the Flow Foundation itself (and even if the Flow Foundation controlled only one signature, the number of so-called independent signatures needed to control the service account would be, at most, three.)

132. Unlike nearly every decentralized blockchain, control over protocol changes is not broadly dispersed or in the hands of the node validators, but in the hands of a concentrated and select few. This is especially true given that the Core Team and/or Flow Foundation effectively hand-picks the other parties who hold the keys to the Flow service account.

133. The Core Team, including Gharegozlou, were aware, or should have been aware, that the highly concentrated governance power and closely held nature of the service account were in tension with Defendants' many public statements affirming that control over the Flow network

was decentralized in the hands of the greater Flow community.

134. While using the service account to track down and destroy the fraudulent tokens was a feasible and appealing solution from a technical point of view, the Core Team was motivated by a major public relations concern: Endowing the service account with administrative superpowers capable of entering individual accounts to recover fraudulent tokens could cause irreparable harm to the public's perception of the Flow blockchain and permanently shatter public trust in Flow's purported decentralization.

135. In short, if a central power such as the Core Team can, effectively, enter your Flow wallet and make changes to your holdings without your permission, then why would you trust anything about the Flow blockchain?

136. Mindful that using the service account to alter account balances would likely spark mass outrage given the lip service that Dapper Labs and the Flow Foundation so often paid to the blockchain's core tenets of decentralization and immutability, they selected a different course of action, one that they hoped would appear more evenhanded and apply across the board.

***The Flow Foundation Announces the Rollback***

137. Instead of tampering with individual accounts contaminated by the exploit, the Flow Foundation announced on X on December 27, 2025, the day of the hack, that "the network will be restored to a checkpoint prior to the exploit."

138. The post went on to state: "The Foundation recognizes this is an inconvenience for users who transacted during this period," however, "[i]t is the safest path to restore network integrity and protect user funds."

139. This plan was known as the "Rollback." It was immediately highly controversial.

140. The Rollback was roundly criticized both on substantive and procedural grounds,

damaging the public's trust in the Flow blockchain.

141. Substantively, many observers viewed the Rollback – returning the blockchain to a state before the exploit, thus erasing all transactions that occurred during the exploit window and effectively rewriting the ledger history – as violating the bedrock principle of blockchain immutability.

142. After all, a key principle of the blockchain is that transaction history should not be re-written once it is finalized.

143. Many commentators expressed the view that rolling back the chain would undermine that principle and destroy trust in the network, and claimed that the Rollback risked making Flow appear more like a centrally managed system than a decentralized blockchain.

144. For instance, Gabriel Shapiro, general counsel at Delphi Labs and a prominent voice on crypto regulation and governance, criticized the rollback plan and suggested it undermined the fundamental blockchain principle of transaction finality.

145. Along similar lines, crypto news outlet Sandmark lamented on December 29:

> Flow broke crypto's golden rule this weekend. Following a relatively minor $3.9mn exploit on 27 Dec 2025, the foundation coordinated with validators to roll back the chain, effectively erasing six hours of history to save a rounding error in total value locked.
>
> <u>***The move has triggered a firestorm of criticism from infrastructure partners who were left in the dark, highlighting the fragility of Flow's "decentralized" claims. If a chain can be paused and rewound at the behest of a foundation, the question becomes whether it is a blockchain at all, or simply a database with extra steps.***</u>

(Emphasis added.)

146. The most influential criticism of the Rollback, however, came from Alex Smirnov, co-founder of deBridge, one of the major providers of bridge services to the Flow blockchain. A bridge is used to trade tokens across different blockchains.

147. Smirnov posted on X: "I woke up to the news about Flow's decision to roll back

the chain. Despite Flow stating that they 'are in a mandatory synchronization window with critical ecosystem partners (bridges, CEXs, DEXs)', I can confirm that deBridge – one of the major bridge providers for Flow – received zero communication or coordination from the Flow team."

148. Smirnov continued: "The rushed decision to roll back the chain will likely cause financial damage far exceeding the impact of the original exploit. A rollback introduces systemic issues that affect bridges, custodians, users, and counterparties who acted honestly during the affected window."

149. Smirnov asked in bewilderment: "Who specifically made the decision to roll back the chain?"

150. Finally, Smirnov publicly urged all Flow validators to refuse to validate transactions on the rolled-back chain until Flow provided some answers.

***The Flow Foundation Announces the Isolated Recovery Plan***

151. Facing this intense public backlash, the Core Team pivoted and abandoned the Rollback.

152. Instead, on December 28, 2025, the day after the exploit, the Flow Foundation announced on twitter that it "has developed a revised remediation plan working with ecosystem partners. This approach was developed following direct consultation with bridge operators, exchanges, and infrastructure partners."

153. The revised remediation plan, known as the "Isolated Recovery Plan," entailed giving the service account super administrative powers that would enable it to enter individual accounts and destroy any counterfeited tokens.

154. The Flow Foundation's post announcing the Isolated Recovery Plan stated that the "Flow core developer team will propose a software upgrade to node operators. This software

upgrade will temporarily enable the Community Governance Council to remediate fraudulent assets. This requires opt-in adoption by independent node operators; no single entity can act unilaterally."

155. While the post confusingly suggested that some noble-sounding entity called the Community Governance Council was doing the remediation, the Technical Implementation Plan attached to the post clarified that the Core Team was empowering the service account to enter accounts and destroy tokens, which is exactly what the Core Team had decided not to do initially so as not to appear as an omnipotent central authority capable of entering individuals' wallets and editing their account balances without their consent.

156. The Technical Implementation Plan provided:

> The remediation actions require elevated permissions that do not exist under normal network operation. The Flow core protocol team has proposed a temporary software upgrade that grants the Service Account the capability to withdraw and destroy tokens from affected accounts.
>
> This upgrade requires opt-in adoption by network validators. Only after validators reach consensus on the upgrade can remediation actions proceed. Upon completion of all remediation activities, a subsequent software version will be provided that revokes these elevated permissions. Validators adopting that version will return the network to standard operational parameters.

157. Just a few hours later, the Flow Foundation announced that the Flow network validators had accepted the software upgrade, known as Mainnet 28, granting the service account the administrative superpowers necessary to remove the fraudulent tokens from user accounts.

158. Some news outlets reported that, in addition to accepting the software upgrade almost immediately, the validators' acceptance of the upgrade was unanimous. It is unclear what those reports were based on.

159. While the Core Team had initially expected mass resistance to the idea of using the service account to enter accounts and alter their balances by destroying tokens, then, it turned out

that the idea of the Rollback was seen as even worse.

160. In sum, while the Core Team was able to avoid the ire of key partners like Smirnov by pitching the Isolated Recovery Plan as a more precise and scalpel-like approach that did not interfere with innocent transactions, the plan alerted the market to the troubling reality that, in practice, the Core Team is in complete control of the Flow blockchain to the point that it can rely on protocol upgrades to enter user accounts and adjust their token balances without the users' consent.

***The Core Team's Actions Were Inconsistent with the Community Governance Practices it Had Committed To***

161. As the Technical Implementation Plan mentioned, in order to give the service account the administrative superpowers necessary to destroy tokens from affected accounts, the Core Team had to release a new version of the protocol. To take effect, the validators had to accept the new version, known as Mainnet 28. This type of protocol upgrade is sometimes called a spork.

162. It was no secret that the Core Team maintains and upgrades the network with sporks from time to time. It was also no secret that, effectively, the Core Team has control over the sporks because the independent validators are highly incentivized to adopt the latest protocol version, no matter what it contains. As the Flow Foundation itself explained publicly:

> Each Validator makes an individual decision of which Protocol Version they choose to use. Since the value of blockchain networks is primarily due to the collectively verified execution state, there is a strong incentive for Validators to choose a Protocol Version that is compatible with the Protocol Version selected by the majority of other Validators. As a practical matter, the Protocol Version chosen by the overwhelming majority of Validators is likely to be the most recent Protocol Version produced and recommended by the Core Team, provided the proposed changes are not contentious. However, if a significant fraction of the community disagrees with any aspect of the most recent Protocol Version, they can band together to use a previous Protocol Version, or some other Protocol Version defined independently from the Core Team. This process of a "contentious forking" is

> rare, but does have several precedents in other networks (REF: Ethereum Classic, Bitcoin Cash).
>
> The process by which the Core Team chooses the updates for each new Protocol Version follows the open process described above, using GitHub as an open discussion platform to gauge the priorities and needs of the entire Flow ecosystem. The proposed changes by the Core Team will be announced and discussed well before they are implemented, and any community member can propose their own changes or contribute code updates to implement any proposed changes. The details of a new Protocol Version are publicly available no less than 14 days before that version is formally recommended for use by Validators (a "Release"), with the complete implementation source code visible for no less than 7 days before a Release.

163. Thus, precisely because validators generally follow the upgrade instructions released by the Core Team, the Core Team had outlined a process for community deliberation and actual, meaningful decentralized control that involved posting a new Release publicly for weeks and allowing the community to discuss it before implementation.

164. Because the Flow blockchain is characterized by a relatively small validator set, because that validator set was historically selected by the Core Team, and because Flow's architecture includes a privileged service account capable of acting with administrative superpowers and minting and destroying tokens, it was especially imperative that the Core Team follow these procedures for ensuring decentralization and community control of the blockchain.

165. When the Core Team rolled out the Isolated Recovery Plan giving superpowers to the service account and then announced hours later that the validators had reached (a purportedly unanimous) consensus, the Core Team followed none of these procedures (even though there was certainly time, as the network was paused).

166. These actions on the part of the Core Team extinguished whatever limited degree of public trust in the decentralization of the Flow blockchain had survived following the Rollback fiasco the day before.

167. Apparently tone deaf to these concerns and attempting to save face, Dapper Labs tweeted on December 29, 2025:

> What happened over the past 48 hours was a stress test of the ecosystem that Dapper helped build. The response required coordination across dozens of independent parties—validators, bridges, exchanges, protocol teams. No single entity controlled the outcome. The recovery emerged from distributed consensus with a range of consultation partners. We're proud of how the Flow ecosystem responded. The initial rollback proposal was reconsidered after partner feedback. The final approach protects legitimate users while neutralizing fraudulent assets. That's the decentralized community consensus system working as intended.

168. To be sure, many in the community, Smirnov included, applauded and approved of the Isolated Recovery Plan. But Smirnov's public criticism excoriating the Core Team for announcing a unilateral rollback with no community input or governance procedures is not the "decentralized community consensus system working as intended."

169. Neither is the Core Team's decision to pivot to exactly what they feared doing initially—using a privileged service account to bring about sweeping changes in the guise of a protocol upgrade that, in contravention of the governance procedures that the Core Team itself had devised, the validators did not even have time to discuss or digest. This was, for all intents and purposes, a top-down, administrative intervention into individual Flow accounts and wallet balances.

170. The actions of the Core Team revealed that the decentralization of the Flow blockchain had been a mirage all along.

***The Core Team's Handling of the Exploit Was Nothing Like the Operation of Other Blockchains***

171. Moreover, the Core Team's handling of the exploit simply did not pass the smell test for a supposedly decentralized blockchain.

172. While several other blockchains have implemented rollbacks and the like in response to exploits or technical difficulties in the past, the process and level of community deliberation was markedly different.

173. For example, in 2016, a vulnerability in a smart contract allowed an attacker to drain about 3.6 million ETH from the Ethereum blockchain.

174. The Ethereum community debated what to do for about five weeks before implementing a hard fork that effectively functioned as a rollback because it reversed the economic effect of the exploit.

175. The community deliberation there lasted more than a month and included discussions in public forums as well as a vote to measure community sentiment.

176. In addition, in September of 2021, the Solana blockchain network experienced a 17-hour outage that caused the validator consensus mechanism to stall.

177. Restarting the network required going back to a recent valid block rather than continuing from the current stalled state. After the developers proposed a new version of the validator software, the validator community discussed the restart plan on public channels, with hundreds of independent validators participating in the restart.

178. In contrast, following the December 2025 exploit, the Core Team, acting through the Flow Foundation, simply announced its chosen plan of action almost immediately. Only after a key ecosystem partner took the extraordinary step of publicly defying the Core Team's hasty unilateral decision to roll back the blockchain did the Core Team pivot to the Isolated Recovery Plan, which relied on a protocol upgrade that the Core Team rammed down the validators' throats while following none of the community governance procedures that it had outlined previously.

179. As it turns out, there is frighteningly little to protect transactions and wallets from

the Core Team. The reality of the Core Team's effective control over the Flow blockchain cannot be reconciled with all of Defendants' statements calling it a fully decentralized blockchain.

180. When push came to shove, the Flow blockchain was decentralized and immutable, until it was not.

181. Given the Core Team's actions in the wake of the hack, it is now clear that trusting the Flow blockchain means trusting the Core Team to act, essentially, as a benevolent leader. But that is not the way blockchains function, and it is not the way the Flow blockchain was described and understood by reasonable investors and/or consumers.

182. Before the exploit, the public had believed that, because Dapper had been trumpeting decentralization for years and because Flow had a network of independent validators, the validators actually exercised meaningful control of the Flow blockchain protocol.

183. This is how most popular blockchains work, and it is true of blockchains such as Bitcoin and Ethereum.

184. While Flow's architecture was different from other blockchains because it separated protocol configuration from network operation and included a privileged service account, it was precisely for that reason that the Core Team had committed to involve the validators and the community in protocol upgrades or sporks.

185. That commitment turned out to be hollow, however, and the Defendants' many public statements touting the "progressive decentralization" and community control of the Flow blockchain misled users and obscured the reality that – unlike nearly every other Proof-of-Stake blockchain – the ability to modify core systems lay with the Core Team, who could effectively control the protocol-level logic of the blockchain at will.

186. The Core Team's response to the exploit exposed that reality, publicly revealing

that the much-touted decentralization of the Flow blockchain was much less robust than widely understood.

***Now that the Market Understands that the Flow Blockchain is not as Described, Investors Have Lost Faith in the Flow Token, and Value of the Flow Token has Plummeted***

187. The Core Team's response to the exploit caused the market to lose faith in the decentralization of the Flow network, and it has decimated the value of the Flow Token.

188. The price of the Flow token fell more than 40% after the Flow Foundation announced the Rollback plan, plunging the Flow ecosystem into a governance crisis, with the trading volume of the Flow token falling by a similar amount.

189. The Core Team's response to the exploit caused the market cap of the Flow token to lose over $100 million within hours. As the market's concerns over Flow's governance and decentralization deepened, losses accelerated and surpassed $400 million.

190. Notably, the commentary on the plunging value of the Flow Token has centered on the governance crisis and lack of trust in the decentralization of the protocol rather than the hack itself. For instance, an article on Coin360, entitled *Flow Blockchain Exploit Triggers Governance Reckoning as $3.9M Breach Sparks Price and Recovery Overhaul*, stated:

> The scale of the price drop far exceeded the dollar value of the exploit itself, signaling a deeper confidence shock tied to governance risk rather than pure financial loss. Relative to the broader crypto price index, FLOW underperformed sharply, reflecting concerns unique to the network rather than macro market pressure. The coin market cap erosion underscored how quickly trust can evaporate when core protocol integrity is questioned.

191. With investor trust gone, the value of the Flow Token has not recovered.

192. Plaintiffs' allegations do not sound in fraud. Even if, in touting Flow as "decentralized," Defendants had intended to express the idea that transactions were validated by independent nodes not controlled by the Core Team, Defendants misled the market into believing that the ultimate governance of the blockchain was much more decentralized than it is.

***The Class Has Suffered Significant Damages from Defendants' Actions***

193. As a direct result of Defendants' unlawful conduct, Plaintiffs and the Class – many of whom are retail investors lacking in technical and financial sophistication – have suffered significant damages in an amount to be proven at trial.

## CLASS ALLEGATIONS

194. Plaintiffs bring this action as a class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Flow Tokens, held them as of December 27, 2025, and were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the Defendants' immediate families and their legal representatives, heirs, successors, assigns, and any entity in which the Defendants are or have been officers, directors, or have or had a controlling interest.

195. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members in the proposed Class. Plaintiffs believe that Class members may be notified of the pendency of this action by mail, email, or similar messaging as directed by the Court, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

196. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the law that is complained of herein.

197. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities-related litigation.

198. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants' statements touting the decentralization of Flow constituted a deceptive act or unfair practice;

b) whether is a causal connection between the deceptive act or practice and the damage incurred;

c) to what extent the members of the Class have sustained damages and the proper measure of those damages.

199. A class action is superior to all other methods of fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**
**Violations of the New York Deceptive Acts and Practices Act**
**N.Y. Gen. Bus. Law § 349**
**Against All Defendants**

200. Plaintiffs repeat and re-allege each and every allegation contained above.

201. Plaintiffs purchased Flow Tokens and have been subjected to Defendants' deceptive acts and unfair practices, and assert this claim on behalf of the Class. At the time of acquisition, Plaintiffs did not know that the Flow blockchain was much less decentralized than it appeared and, accordingly paid a premium for and/or ascribed an inflated value to the Flow Tokens.

202. Defendants engaged in deceptive and unfair practices prohibited by New York

General Business Law § 349 by, among other things, misleading Plaintiffs and others into believing that the Flow blockchain was decentralized and meaningfully controlled by the community.

203. The unfair and deceptive trade acts and practices of Defendants are consumer-oriented, are materially misleading, and have directly, foreseeably, and proximately caused damages and injury to Plaintiffs and the other members of the Class.

204. As a direct consequence of Defendants' unfair conduct and deception, Plaintiffs and members of the Class have been damaged in that they spent money on Flow Tokens they would not have otherwise spent. In addition, Plaintiffs and members of the Class did not receive a lasting value for the Flow Tokens, as the Flow blockchain and ecosystem were not as described.

205. Defendants' acts and practices amount to acts or uses by Defendants of deception and unfair commercial practices, in violation of New York General Business Law § 349.

## <u>COUNT II</u>
## Violations of the New York False Advertising Act
## N.Y. Gen. Bus. Law § 350
## <u>Against All Defendants</u>

206. Plaintiffs repeat and re-allege each and every allegation contained above.

207. Defendants were engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350, the New York False Advertising Act ("NY FAA").

208. The NY FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350.

209. Defendants caused to be made or disseminated throughout New York and beyond, statements that were untrue or materially misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading

to consumers, including Plaintiffs and the other members of the Class.

210. Defendants violated the NY FAA, as Defendants misleadingly marketed the Flow blockchain and ecosystem as decentralized, when, in reality, power was concentrated in the hands of a small group such that buying Flow Tokens entailed entrusting one's assets to the Core Group rather than to blockchain protocol.

211. Had Plaintiffs and the Class known the truth, they would not have purchased Flow Tokens at the prices they did, or at all.

212. Accordingly, Plaintiffs and the Class overpaid for the Flow Tokens and did not receive the benefit of the bargain for these assets.

**COUNT III**
**Violations of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 et seq.**
**Against All Defendants**

213. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

214. Defendants qualify as "persons" as defined by California Business and Professions Code section 17201.

215. By engaging in the above-described unfair and unlawful business acts and practices, Defendants committed one or more acts of unlawful or unfair conduct within the meaning of California Business and Professional Code section 17200 (the "UCL"). These acts and practices constitute a continuing and ongoing unlawful business activity as defined by the UCL, and justify the issuance of an injunction, restitution, and other equitable relief pursuant to the UCL.

216. Defendants' acts and practices alleged herein constitute a continuing and ongoing unlawful business activity defined by the UCL. Defendants have violated the unlawful prong of

the UCL by deceptively touting the Flow blockchain as decentralized in a misleading manner pursuant to the state laws asserted herein.

217. Defendants' acts and practices alleged herein also constitute a continuing and ongoing unfair business activity defined by the UCL. Defendants' conduct is contrary to the public welfare as it transgresses civil statutes, violates established public policy, including the policies underlying the statutes and laws identified herein and has been pursued to attain an unjustified monetary advantage for Defendants. Accordingly, Defendants' business practices and acts have been immoral, unethical, oppressive, and unscrupulous, and have caused injury far greater than any alleged countervailing benefit.

218. Much of Defendants' acts and practices at issue in this matter were directed at and caused harm to California and California residents.

219. Absent Defendants' acts and practices, Plaintiffs and members of the Class would not have purchased Flow Tokens at the prices paid, or at all.

220. As a direct and proximate consequence of the actions identified herein, Plaintiffs and members of the Class have suffered and continue to suffer injury in fact, including economic loss and loss of property.

221. Plaintiffs seek an order of this Court awarding restitution and injunctive relief and all other relief allowed under the UCL, and such other and further relief as this Court may deem just and proper.

## COUNT IV
## Violations of the Florida Deceptive and Unfair Trade Practices Act
## Florida Stat. § 501.201 et seq.
## Against All Defendants

222. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

223. This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., et seq. ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

224. Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat.

225. Defendants are engaged in trade or commerce within the meaning of the FDUTPA.

226. Much of Defendants' acts and practices at issue in this matter were directed at and caused harm to Florida and Florida residents.

227. Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

228. Defendants' unfair and deceptive practices as described herein are objectively likely to mislead consumers acting reasonably in the circumstances.

229. Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

230. Plaintiffs and Class members have been aggrieved by Defendants' unfair and deceptive practices.

231. The harm suffered by Plaintiffs and Class members was directly and proximately caused by the deceptive and unfair practices of Defendant, as more fully described herein.

232. Absent Defendants' acts and practices described herein, Plaintiffs and members of the Class would not have purchased the Flow Tokens at the prices paid, or at all.

233. Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and members of the Class make claims for actual damages, attorneys' fees and costs.

## COUNT V
## Violations of the New Jersey Consumer Fraud Act
## N.J.S.A. § 56:8-1 et seq.
## Against All Defendants

234. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

235. Plaintiffs and Class members are "persons" under the New Jersey CFA.

236. Defendants are also "persons" under the New Jersey CFA.

237. The Flow Tokens offered to Plaintiffs and the Class constitute "merchandise" as defined by N.J.S.A. 56:8-1 to include "services or anything offered, directly or indirectly to the public for sale."

238. Defendants have violated the New Jersey CFA by engaging in the unfair and deceptive practices as described herein. Defendants' affirmative acts offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

239. In particular, Defendants engaged in deceptive practices and misrepresentations when they portrayed the Flow blockchain and ecosystem as decentralized as described herein.

240. Defendants' deceptive practices were intended to be relied upon and created a likelihood of confusion and misunderstanding among purchasers of the Flow ecosystem's native token, the Flow Token.

241. The harm suffered by Plaintiffs and Class members was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

242. Absent Defendants' acts and practices described herein, Plaintiffs and members of the Class would not have purchased the Flow Tokens at the prices paid, or at all.

243. As a result of Defendants' misconduct, Plaintiffs and Class Members suffered ascertainable losses that are compensable as provided in the New Jersey CFA.

## COUNT VI
## Unjust Enrichment
## Against All Defendants

244. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

245. Plaintiffs conferred a monetary benefit upon Defendants, and Defendants accepted funds that they knew, or should have known, were derived from the unfair or deceptive practices described herein.

246. With Plaintiffs' money, Defendants enriched themselves.

247. Defendants have knowledge of the benefits that Plaintiffs conferred on them.

248. Under principles of equity and good conscience, Defendants should not be permitted to retain the funds and assets they received as a result of their misleading promotion of Flow as a decentralized blockchain to the unknowing Plaintiffs.

249. As a result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

250. To the extent permitted by law, Plaintiffs and the Class seek restitution of all funds and assets that Defendants have unjustly received as a result of their conduct alleged herein, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable, as well as all other relief the Court deems necessary to make them whole.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

a) That the Court determine that this action may be maintained as a class action, that Plaintiffs be named as Class Representatives of the Class, that the undersigned be named as Lead Class Counsel of the Class, and direct that notice of this action be given to Class members;

b) That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the laws set forth above;

c) That the Court award Plaintiffs and the Class damages in an amount to be determined at trial;

d) That the court issue appropriate equitable and any other relief against Defendants to which Plaintiffs and the Class are entitled;

e) That the Court award Plaintiffs and the Class pre- and post-judgment interest;

f) That the Court award Plaintiffs and the Class their reasonable attorneys' fees and costs of suit; and

g) That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: September 3, 2026

**THE ROSEN LAW FIRM, P.A.**

/s/ *Phillip Kim*
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Michael Cohen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: mcohen@rosenlegal.com

*Counsel for Plaintiffs*